## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANDRES M. LANDOR | * | CIVIL ACTION NO. 6:13-2759 |
| VS. | * | JUDGE DOHERTY |
| SOCIETY OF THE ROMAN CATHOLIC CHURCH OF THE DIOCESE OF LAFAYETTE, ET AL | * | MAGISTRATE JUDGE HILL |

## <u>REPORT AND RECOMMENDATION</u>

Pending before the undersigned for Report and Recommendation are the 12(b)(6)

Motions to Dismiss filed by defendants, Society of the Roman Catholic Church of the Diocese

of Lafayette (the "Diocese"), Teurlings Catholic High School, Inc. ("Teurlings"), Michael

Boyer ("Boyer"), Robert Baudier ("Baudier"), and Tiffany Dugas ("Dugas"), on November 26,

2013 [rec. doc. 7]; the Motion to Dismiss Pursuant to F.R.C.P. 12(b)(6) filed by defendants,

Detective Stephen Bajat ("Bajat") and Lafayette City-Parish Consolidated Government

("LCG")[1], on November 27, 2013 [rec. doc. 8]; the Rule 12(b)(6) Motion to Dismiss filed by

defendant, Elizabeth Menard ("Menard"), on December 13, 2013 [rec. doc. 18]; the 12(b)(6)

Motion to Dismiss First Amended Complaint filed by the Diocese, Teurlings, Boyer, Baudier,

and Dugas on January 7, 2014 [rec. doc. 35]; the Motion to Dismiss First Amended Complaint

Pursuant to F.R.C.P. 12(b)(6) filed by Bajat and LCG on January 13, 2014 [rec. doc. 43]; the

Motion to Strike Second Supplemental Complaint Paragraphs 71 and 73 filed by Bajat, LCG,

---

[1]LCG was substituted for the Lafayette Police Department in the Amended Complaint filed on January 5, 2014.  [rec. doc. 30].

and Chief of Police James "Jim" Craft ("Craft") on April 10, 2014 [rec. doc. 60], and the Motion to Dismiss Supplemental Complaints Pursuant to F.R.C.P. Rule 12(b)(6) filed by LCG, Bajat, and Craft on April 10, 2014 [rec. doc. 61].  Plaintiffs, Andres M. Landor and Lavern Landor ("Mr. and Mrs. Landor"), personally and on behalf of their minor daughter, J.L., filed oppositions to the motions.  [rec. docs. 27, 38, 47, 63, 64].  LCG, Bajat and Craft filed a Reply to Plaintiffs' Opposition [rec. doc. 64] on May 9, 2014.  [rec. doc. 65].

Oral argument was held on May 27, 2014, after which the undersigned took the motions under advisement.

For the following reasons, I recommend that the Motions to Dismiss [rec. docs. 7, 8, 18, 35, 43, 61] be **GRANTED**, that the Motion to Strike [rec. doc. 60] be **DISMISSED AS MOOT**, that all federal claims filed by plaintiffs be **DISMISSED WITH PREJUDICE** and that all state law claims filed by plaintiffs be **DISMISSED WITHOUT PREJUDICE**.

## Background

Plaintiffs, Andres Landor, a black male, and Lavern Landor, a black female, are the parents of J.L., who was at all times material hereto a student at Teurlings Catholic High School.  Andres Landor is also a police officer with the Lafayette City Police Department ("LPD"), a division of the Lafayette City-Parish Consolidated Government ("LCG").

Teurlings is one of the schools of the Diocese of Lafayette, Louisiana (the "Diocese"). [rec. doc. 1, Complaint, ¶ 8; Exhibit 2, handbook].  Michael Boyer ("Boyer"), served as Teurlings' principal.  [rec. doc. 1, ¶ 15].  Robert Baudier ("Baudier") served as assistant principal of Teurlings.  [rec. doc. 1, ¶ 16].

Teurlings' handbook states that the school does not "discriminate on any national or ethnic basis in administration of the school's educational policies, scholarship and financial aid programs, athletics, or any other school-administered program."  [rec. doc. 1,  ¶ 13, Exhibit 2].

Additionally the Diocese's school policy states as follows:

[I]n compliance with Title IX of the Civil Rights Act of 1964, no person in the schools of the Diocese shall, on the basis of sex, be excluded from participation in, or be denied the benefits of, or be subjected to discrimination under any educational program or activity except as permitted under said Title IX. This policy applies to all schools under diocesan auspices.

[rec. doc. 1, Exhibit 1, p. 2].

J.L., a black female, was a member of Teurlings' Junior Varsity cheerleading squad. Elizabeth Menard's ("Menard") daughter, a white female, was a Teurlings JV cheer squad teammate of J.L.'s.  [rec. doc. 1, ¶ 10].  Tiffany Dugas ("Dugas"), a white female, was a computer science teacher at Teurlings who served as faculty sponsor of Teurlings' JV cheer squad.  [rec. doc. 1, ¶ 17].

On or about October 1, 2012, J.L. notified Michelle Courville ("Courville"), a white female who was Teurlings' JV cheer squad coach, that she would not be cheering at Teurlings' upcoming football game because her mother, Lavern Landor, was having a birthday celebration that evening.  [rec. doc. 1, ¶26].  On or about October 3, 2012, J.L. informed her mother that Dugas had warned her that if she did not attend the game, she would receive a demerit. [rec. doc. 1, ¶ 27].  Later that day, Mrs. Landor left voice messages with Dugas and Courville informing them that J.L. would be missing the game because she had to attend the

3

family event scheduled for the same night.  [rec. doc. 1, ¶ 28].  Neither Dugas or Courville

responded to the voice messages.  [rec. doc. 1, ¶ 29].

On or about October 8, 2012, M.P., a black female member of the Teurlings JV cheer

squad, told J.L. that she overheard Dugas, Courville and several white JV cheer squad

members discussing J.L.'s Instagram account and postings.  [rec. doc. 1, ¶ 30].  After speaking

with M.P., J.L. removed all Teurlings cheerleaders from her Instagram profile.  [rec. doc. 1, ¶

31].

On or about October 22, 2012, Assistant Principal Baudier contacted J.L.'s mother and

claimed that he had received photos of J.L. from an anonymous source.  [rec. doc. 1, ¶ 32].  He

stated that J.L. was being suspended because of the photos, and directed Mr. and Mrs. Landor

to speak to him at Teurlings regarding the details.

When Mr. and Mrs. Landor arrived at the school, Baudier produced photos from J.L.'s

Instagram account.  [rec. doc. 1, ¶ 33].  One of the photos appeared to have been taken while

J.L. was in class, which was against school policy.  In another photo, which was taken at home,

J.L. was wearing a shirt with Teurlings' mascot in which her stomach area was partially

exposed.

Baudier told J.L.'s parents that because of the photos, J.L. was being suspended from

school for one day and from cheering for one game.  [rec. doc. 1, ¶ 34].  When the Landors

asked about the source of the photos, Baudier told them that the pictures came from students

and were provided to him on October 19, 2012.  [rec. doc. 1, ¶ 35].

Upon arriving at home, Mr. and Mrs. Landor asked J.L. about the photos.  [rec. doc. 1, ¶ 36].  She told them that the school picture was taken during Homecoming week, and that she did not believe that she had violated school policy because other students were taking pictures of themselves in their teachers' presence.  J.L.'s parents contacted Baudier and told him about the pictures being taken during Homecoming week, and asked why he did not investigate before suspending J.L.  [rec. doc. 1, ¶ 37].

Shortly after the Landors spoke with Baudier, J.L. told them about a friend request that she had received on Instagram on or about October 19, 2012, from an alleged cheering organization.  [rec. doc. 1, ¶ 38].  J.L. advised that upon accepting the request, she noticed that she was the only friend on the organization's webpage.

After receiving this information, J.L.'s parents requested a meeting with Baudier.  [rec. doc. 1, ¶ 39].  On or about October 26, 2012, J.L.'s parents and her grandmother, Barbara Landor, an assistant principal at a Lafayette Parish public school, met with Baudier and Principal Boyer. [rec. doc. 1, ¶ 40].  Boyer informed them that on further investigation, both teachers and students had informed him that some students had been taking pictures in class during Homecoming week with teachers' knowledge.  Additionally, Baudier reported that students had told Dugas about the photos and she then gave them to the administration.  [rec. doc. 1, ¶¶ 41, 42].

Mr. and Mrs. Landor asked Boyer to investigate further in light of J.L.'s Instagram friend request.  [rec. doc. 1, ¶ 43].  They also handed Baudier and Boyer several pictures of white Teurlings students who appeared to be at school when the photos were taken, or who

were wearing Teurlings uniforms and/or paraphernalia at off-campus locations.  The pictures

included comments/captions with vulgar language or racial slurs.

J.L.'s parents told Baudier and Boyer that they believed that their daughter was being

maliciously targeted by the person(s) producing the photos to impugn her character, damage

her reputation, and destroy her credibility as a member of the cheer squad and as a school

representative.  [rec. doc. 1 , ¶ 44].

Boyer told Mr. and Mrs. Landor that J.L.'s school suspension would be lifted.  [rec.

doc. 1, ¶ 45].  However, J.L. had already missed a day of school in connection with the

suspension. [rec. doc. 1, ¶ 46].

J.L.'s parents re-urged the administration to ask Dugas how she had obtained the

pictures.  [rec. doc. 1, ¶ 47].  Boyer stated that he would speak to Dugas and respond to the

Landors no later than October 29, 2012.  After J.L.'s parents failed to hear from Boyer, they

contacted Chancellor Father Hampton Davis ("Father Davis") with the Diocese.  [rec. doc. 1, ¶

48].

On November 1, 2010, Mr. and Mrs. Landor met with Father Davis at Our Lady Queen

of Peace and described the events that had transpired.  [rec. doc. 1, ¶ 49].  They informed

Father Davis that they intended to file an incident report with Lafayette City Police Department

for cyberbullying.  [rec. doc. 1, ¶ 50].

On or about November 2, 2012, Boyer called J.L.'s parents and told them that Dugas

had refused to reveal the names of the students who had given her with J.L.'s photos.  [rec.

doc. 1, ¶ 52].  Boyer advised that after the 2012 football season, Dugas would no longer be

faculty adviser to the JV cheer squad.  Andres Landor then informed Boyer that he and his wife had decided to file a police report to start a cyberbullying investigation.  [rec. doc. 1, ¶ 53].

On or about November 5, 2010, Andres Landor spoke with LPD Detective Stephen Bajat ("Bajat") about the alleged cyberbulling, and provided Bajat with copies of the photographs of J.L. [rec. doc. 1, ¶ 54].  Bajat indicated that he would start an investigation. [rec. doc. 1, ¶ 55].  On or about November 9, 2012, Bajat advised Mr. and Mrs. Landor that the Instagram profile on the cheering organization that friended J.L. was created on October 19, 2012 at 7:54 a.m.  [rec. doc. 1, ¶ 56].

Shortly afterwards, Father Davis contacted J.L.'s parents and told them that a JV cheerleader's parent had admitted creating the Instagram profile. [rec. doc. 1, ¶ 57].  On or about November 14, 2014, Mr. and Mrs. Landor met with Boyer, Baudier and Father Davis at Teurlings.  [rec. doc. 1, ¶ 58].  Boyer reported that an anonymous parent had sent a letter to the administration explaining her motive for creating the profile.  Boyer and Baudier did not answer any of the Landors' questions about the letter's contents.  [rec. doc. 1, ¶¶ 59, 60].

In early December, 2012, Andres Landor spoke with Bajat's supervisor, Sgt. Christopher Trahan ("Trahan").  [rec. doc. 1, ¶ 64].  Andres Landor told Trahan that he believed that Bajat was biased towards Teurlings' administration because of Bajat's off duty detail security work at Teurlings' football games.  Trahan said that he did not believe that Bajat had  demonstrated any undue bias.

On or about December 6, 2012, Bajat contacted J.L.'s parents and stated that he had met with Baudier and Boyer at Teurlings.  [rec. doc. 1, ¶ 65].  Bajat stated that Boyer and Baudier informed him that Elizabeth Menard ("Menard"), with her daughter's assistance, had created the fake Instagram profile.  The Landors confirmed that they wanted Menard to be served with a misdemeanor summons, as well as further investigation to determine if Dugas was involved.  Bajat told them that the administration had already dealt with Dugas, and that he did not feel comfortable questioning Menard and her daughter about the profile.  [rec. doc. 1, ¶ 66].

Andres Landor contacted Trahan and told him about his conversation with Bajat.  [rec. doc. 1, ¶ 67].  Trahan indicated that he would follow up with Bajat.

On December 12, 2012, Trahan informed Andres Landor that Bajat had sent Trahan an email indicating that there was no statutory basis for the Landors' complaint against Menard.  [rec. doc. 1, ¶ 68].  Andres Landor requested that Bajat interview Menard and her daughter and forward the case to the District Attorney's office to determine its merits.  [rec. doc. 1, ¶ 69].  Thereafter, Trahan informed Andres Landor that he had directed Bajat to interview Menard and her daughter, but he refused.  [rec. doc. 1, ¶ 70].

The complaint alleges that after the Instagram incident, J.L. was "treated like a pariah" by Teurlings administration, Dugas, and all of the white JV cheerleaders and their parents.  [rec. doc. 1, ¶ 71].  She was isolated during travel to away games and not included in other regular events.  Additionally, other white students at school stopped talking to, and formally engaging with, her.  [rec. doc. 1, ¶ 72].

It is alleged that as a result of this mistreatment, J.L. sustained weight and appetite loss, became withdrawn and despondent, and had recurring nightmares about Dugas, Boyer and Baudier.  [rec. doc. 1, ¶ 73].  Mr. and Mrs. Landor sought counseling for J.L.

On September 28, 2013, Mr. and Mrs. Landor, personally and on behalf of J.L., filed a Complaint for Damages pursuant to Title VI, 42 U.S.C. § 2000d, *et seq*.; 42 U.S.C. §§ 1981, 1983 and 1988; U.S. Const. amend. XIV, and LA. CIV. CODE articles 2315, 2316 and 2320, against the Diocese, Teurlings, Boyer, Baudier, Dugas, Menard, Bajat, and LPD.[2]  [rec. doc. 1].  On January 5, 2014, plaintiffs filed a (First) Amended Complaint to substitute LCG for LPD.  [rec. doc. 30, ¶ I].

On December 12, 2013, plaintiffs filed a Motion for Leave to File Supplemental Complaint [rec. doc. 16], which was granted by Order dated January 8, 2014.  [rec. doc. 42].

In the Supplemented Complaint, plaintiffs assert that on or about October 14, 2013, Bajat filed a complaint with LPD Internal Affairs ("IA") against Andres Landor alleging that he engaged in unprofessional conduct, to wit, making false statements about Bajat in the instant case.  [rec. doc. 44, ¶ IV].  On or about December 3, 2013,  Andres Landor's counsel requested a hearing before Civil Service on Andres Landor's behalf.  [rec. doc. 44, ¶ XI].  On or about December 10, 2013, Civil Service directed Andres Landor to seek relief through this Court.  [rec. doc. 44, ¶ XII].

---

[2]Plaintiffs withdrew their request for injunctive relief.  [rec. doc. 27, p. 1].

On January 15, 2014, Andres Landor and his counsel appeared for questioning by IA agents.  [rec. doc. 58, ¶ 21].  On February 5, 2014, Andres Landor received a Pre-Disciplinary Hearing notice from Sgt. Chastity Arwood ("Arwood") setting a *Loudermill*[3] hearing for February 12, 2014.  [rec. doc. 58, ¶ 27].  On February 6, 2014, Landor's counsel sent a letter to LPD stating that she had a conflict with hearing date as well as advising of her availability.  [rec. doc. 58, ¶ 29].

By letter dated February 10, 2014, Sgt. Arwood informed counsel that Andres Landor would not be compelled to make any statements or answer any questions at the hearing, which would be recorded and transcribed.  [rec. doc. 58, ¶ 30].  Counsel replied that she wished to receive a copy and/or explanation of the evidence LPD was using to substantiate the charges against her client.  [rec. doc. 58, ¶ 31].  When she did not receive a response, she wrote LPD again stating that because Andres Landor could not be represented by counsel of choice, she had advised him not to answer any questions at the hearing.  [rec. doc. 58, ¶¶ 32-34].

After receiving counsel's correspondence, Sgt. Arwood told Andres Landor that Chief Craft had directed him to appear for the hearing as scheduled.  [rec. doc. 58, ¶ 35].  Andres Landor advised that he was seeking representation by Danny Landry ("Landry"), counsel for civil service employees, and requested delay of the hearing because Landry had a conflict.  [rec. doc. 58, ¶ 36].  Sgt. Atwood repeated that the Chief had directed him to appear. [rec. doc. 58, ¶ 37].

---

[3]*See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

On February 12, 2014 Andres and Lavern Landor, along with J.L., appeared for the hearing.  [rec. doc. 58, ¶ 38].  Andres Landor stated that he wanted J.L. to represent him during the hearing.  [rec. doc. 58, ¶ 39].  Craft denied his request, and refused to allow Lavern Landor and J.L. to be present at the hearing.  [rec. doc. 58, ¶ 40].

On or about February 19, 2014, Landry told Andres Landor that he had received a letter from Craft stating that a final decision regarding his pre-disciplinary hearing would be made on February 20, 2014.  [rec. doc. 58, ¶ 48].  To date, Craft has not formally ruled in writing on Bajat's complaint against Andres Landor.  [rec. doc. 58, ¶ 67].

On the morning of February 21, 2014, Andres Landor received a text from his office mate, Michael Boutte ("Boutte") stating that Boutte, Andres Landor and Agent Jace Quibodeaux ("Quibodeaux") had been transferred from Metro, a unit that specializes in investigations (undercover and informant), to Patrol, a unit that responds to service/dispatch calls.  [rec. doc. 58, ¶¶ 57-58].

The complaint alleges that Metro agents are plain-clothed, drive unmarked vehicles and are given a yearly clothing allowance.  [rec. doc. 58, ¶ 59].  To serve in Metro, an agent must serve on Patrol for a number of years.  Officers who serve in Metro are allowed to keep their badges. [rec. doc. 58, ¶ 63].According to the complaint, Patrol is considered entry-level basic training grounds for all officers seeking to move further within the agency.  [rec. doc. 58, ¶ 59].  No specialized training is required for Patrol.

When Andres Landor inquired about his move to Patrol, his Captain, Dwayne Prejean ("Prejean"), advised that a new policy limiting time in Metro to six years had been

implemented as of February 21, 2014.  [rec. doc. 58, ¶ 60).  Andres Landor's Metro badge was taken from him.  [rec. doc. 58, ¶ 64].

On March 18, 2014, plaintiffs filed a Second Supplemented Complaint alleging claims against LPD through LCG and Craft, personally, pursuant to 42 U.S.C. § 1983, *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and U.S. Const. amend. I and XIV.  [rec. doc. 58, ¶ 3].  In the Second Supplemented Complaint, plaintiffs allege, among other things, that Andres Landor's transfer from Metro to Patrol constituted a *de facto* adverse employment decision in retaliation for Andres Landor's filing suit against Bajat and LCG.  [rec. doc. 58, ¶ 68].

Defendants filed the motions to dismiss and motion to strike referenced above, which were heard in open court on May 27, 2014.

## Motion to Dismiss Standard

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (*quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face."  *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Harold H. Huggins Realty, Inc.*, 634 F.3d at 796 (*quoting Iqbal*, 129 S.Ct. at 1949).  This includes the basic requirement that the facts plausibly establish each required element for each legal claim. *Coleman v. Sweetin*, 745 F.3d 756, 763 (5th Cir. 2014) (*citing Iqbal*, 129 S.Ct. at 1949; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 1966, 167 L.Ed.2d 929 (2007)).  However, a complaint is insufficient if it offers only "labels and conclusions," or "a formulaic recitation of the elements of a cause of action."  *Id.* (*quoting Iqbal*, 556 U.S. at 678).

## Law and Analysis

### Claims Against the Diocese and Teurlings

#### *Title VI Claim*

Plaintiffs assert a claim under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.*, against the Diocese and Teurlings.  [rec. doc. 38, p. 4].  The Title VI claim is the only one asserted against the Diocese.

Enacted as part of the Civil Rights Act of 1964, § 601 of Title VI, 42 U.S.C. § 2000d. states a broad prohibition of the use of federal funds to aid discrimination:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

*United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 96 (5th Cir. 1992).

Plaintiffs argue that Title VI applies to all schools that receive any federal funding.  The handbook states that the Diocese is bound by Title IX, which indicates that it receives federal funding.  [rec. doc. 1, Exhibit 1, p. 2].

The Fifth Circuit describes Title VI as the "model" for Title IX.  *Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 397 (5th Cir. 1996).  However, Title VI itself directly reaches only instances of intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 281, 121 S.Ct. 1511, 1516, 149 L.Ed.2d 517 (2001); *Price ex rel. Price v. Louisiana Dep't of Educ.*, 329 Fed. Appx. 559, 561 (5th Cir. 2009).

In order to state a cause of action for a violation of Title VI, the plaintiff must plead facts establishing that the defendant intentionally discriminated on the basis of race, color or national origin. *Price*, 329 F.Appx. at 561; *Williams v. U.S. Dep't of Agric.*, 2011 WL 1239890, *2 (M.D. La. Mar. 30, 2011).

Here, plaintiffs' complaint falls short of the Title VI requirement that a litigant plead facts in support of intentional discrimination.  *Price*, 329 Fed.Appx. at 561 (*citing Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 397 (5th Cir.1996) (noting that "a Title VI plaintiff must prove discriminatory intent")).  The complaint contains only broad allegations that the Diocese failed to intervene in J.L.'s suspension and that Teurlings failed to conduct a thorough investigation of the fake Instagram incident.  [rec. doc. 1, ¶¶ 85-94].  The complaint does not contain a single allegation of discriminatory intent on the part of the Diocese or the other institutional defendants, and thus fails to state a valid claim against them.  *Alexander v. Choate*, 469 U.S. 287, 293, 105 S. Ct. 712, 716, 83 L. Ed. 2d 661 (1985).

Accordingly, plaintiffs' claim under Title VI must fail.

## Claims Against Teurlings and Bajat

### *Section 1981 Claim*

Count II alleges that Teurlings is liable to plaintiffs pursuant to 42 U.S.C. § 1981 for

violation of plaintiffs' substantive right to contract.  [rec. doc. 38, p. 9].

Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties,
> give evidence, and to the full and equal benefit of all laws and proceedings for
> the security of persons and property as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, penalties, taxes, licenses, and exactions of
> every kind, and to no other.

42 U.S.C.A. § 1981.

Section 1981 was originally enacted as part of the Civil Rights Act of 1866 and covered

"only conduct at the initial formation of the contract and conduct which impairs the right to

enforce contract obligations through legal process."  *Smith v. Cleco Corp*., 927 F.Supp.2d 382,

386 (W.D. La. 2013) (*quoting Patterson v. McLean Credit Union*, 491 U.S. 164, 179, 109

S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989)).  Section 1981 "did not protect against harassing

conduct that occurred after the formation of the contract."   *Jones v. R.R. Donnelley & Sons

Co.*, 541 U.S. 369, 372, 124 S.Ct. 1836, 1840, 158 L.Ed.2d 645 (2004) (*citing Patterson*, 491

U.S. 164, 109 S.Ct. 2363).  Section 1981 was later amended by the Civil Rights Act of 1991 to

create a cause of action for discriminatory and retaliatory conduct occurring after the formation

of the contract.  *Jones*, 541 U.S. at 372, 124 S.Ct. at 1840.

Among the many statutes that combat racial discrimination, § 1981 has a specific function: It protects the equal right of "[a]ll persons within the jurisdiction of the United States" to "make and enforce contracts" without respect to race.  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474-75, 126 S. Ct. 1246, 1249, 163 L. Ed. 2d 1069 (2006) (*citing* 42 U.S.C. § 1981(a)).  The statute currently defines "make and enforce contracts" to "includ[e] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id*. (*citing* 42 U.S.C. § 1981(b)); *Cox v. Vela*, 2014 WL 345675, *3 n. 1 (S.D. Tex. Jan. 30, 2014).

Section 1981 offers relief from racial discrimination that "blocks the creation of a contractual relationship" or "impairs an existing contractual relationship" but only where the plaintiff has, or would have, rights under the existing or proposed contractual relationship. *Grambling Univ. Nat. Alumni Ass'n v. Bd. of Sup'rs for Louisiana Sys.,* 286 Fed.Appx. 864, 869 (5th Cir. 2008) (*per curiam*) (*citing Domino's* 546 U.S. at 476, 126 S.Ct. at 1250).

To state a claim for relief under § 1981, a plaintiff must allege (1) that he is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerns one or more of the activities enumerated in the statute.  *Green v. State Bar of Texas,* 27 F.3d 1083, 1086 (5th Cir.1994).  The "enumerated activity" implicated in this case is the right to "make and enforce contracts."  *Id.*

A conclusory allegation that the right to make and enforce contracts has been violated is insufficient. Instead, a plaintiff must (1) "identify the content of the contract at issue," (2) identify "the particular contractual rights" that were allegedly modified by the defendant's

actions, and (3) plead facts showing that the defendant's actions were motivated by discriminatory intent.  *Vouchides v. Houston Community College System*, 2011 WL 4592057, *8  (S.D. Texas Sept. 30, 2011) (*citing Grambling*, 286 F.Appx. at 870; *cf. Domino's*, 546 U.S. at 476 ("Any claim brought under § 1981, therefore, must initially identify an impaired "contractual relationship, § 1981(b), under which the plaintiff has rights.")).

Here, plaintiffs have failed to state the basic elements of a Section 1981 claim.  While plaintiffs make allegations that Teurlings "contracts with the parents of students, students, and teachers attending its school" and that Teurlings' handbook contains an anti-discrimination policy [rec. doc. 1, ¶¶ 11, 13], they fail to identify the specific contract or contract terms that defendants modified through their actions.  *Grambling*, 286 F.Appx. at 869.

Additionally, plaintiffs' pleadings do not show racial animus on the part of defendants regarding any contractual decisions. *Whitehurst v. Showtime Networks, Inc.*, 2009 WL 3052663 (E.D. Tex. Sept. 22, 2009) (*citing Grambling*, 286 F. Appx at 870 (considering no showing of racial animus as a motivating factor in holding that Section 1981 claim was "implausible" under pleading requirements of *Twombly*)); *see also Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir.1997) ("a cause of action for racial discrimination in the making and enforcement of contracts, under § 1981, requires the plaintiff to demonstrate intentional discrimination.").  Accordingly, plaintiffs' claims should be dismissed for failing state a claim under §1981.

### *Section 1983 Claim Against Teurlings*

Section 1983 provides a cause of action against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State" violates another's constitutional rights. 42 U.S.C. § 1983.  This statute confers no substantive rights, but merely provides a remedy for the rights that it designates.  *Johnston v. Harris County Flood Control Dist*., 869 F.2d 1565, 1574 (5th Cir. 1989).

To state a section 1983 claim, a plaintiff must: (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.  *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1935 (2014).

In the Complaint, plaintiffs assert that Teurlings assumed the character and authority of a state actor when it conspired with Bajat to impede and eventually terminate the alleged cyberbullying investigation.  [rec. doc. 1, ¶ 97].  However, plaintiffs have cited no legal authority to support its allegation that Teurlings, which is a private Catholic school, is a "state actor."  Accordingly, there is no basis for a § 1983 claim against Teurlings.

### *Section 1983 Claim Against Teurlings and Bajat*

To the extent that plaintiffs attempt to allege a conspiracy under § 1983, they have failed to allege facts sufficient to give rise to a claim that Teurlings and Bajat conspired to deprive them of their constitutional rights.  Although a section 1983 plaintiff may assert conspiracy claims, such a claim is not actionable without an underlying violation of section 1983.  *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995) (*citing Pfannstiel v. City of Marion*,

918 F.2d 1178, 1187 (5th Cir.1990), *abrogated on other grounds by Martin v. Thomas*, 973

F.2d 449 (5th Cir. 1992)).  Rather, a conspiracy allegation under § 1983 allows a plaintiff to

"impose liability on all of the defendants without regard to who committed the particular act."

*Golla v. City of Bossier City*, 687 F.Supp. 645, 662 (W.D. La. 2009) (*citing Hale*, 45 F.3d at

920).

To state a claim for conspiracy under section 1983, a plaintiff must allege the existence

of (1) an agreement to do an illegal act and (2) an actual constitutional deprivation. *Cinel v.*

*Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). To that end, plaintiff is required to plead enough

facts to state a claim for relief that is plausible on its face. *Twombly*, 127 S.Ct. at 1974.

General conclusory charges of conspiracy with no specific allegation of facts tending to

show a prior agreement cannot survive a motion to dismiss.  The complaint must include

specific factual allegations showing a prior agreement, plan or meeting of the minds between

or among the defendants. The bare assertion of a conspiracy will not suffice. *See Twombley*,

127 S.Ct. at 1966; *see also Rodriguez v. Neeley*, 169 F.3d 220, 222 (5th Cir. 1999).

Stated differently, plaintiffs' facts, when "placed in a context . . . [must raise] a

suggestion of a preceding agreement, not merely parallel conduct that could just as well be

independent action."  *Twombly*, 127 S.Ct. at 1966; *Jabary v. City of Allen*, 547 Fed.Appx. 600,

611 (5th Cir. 2013) (*citing Twombly*); *Bohannan v. Doe*, 527 Fed.Appx. 283, 300 (5th Cir. 2013)

(citations omitted) ("A plaintiff must 'allege specific facts to show an agreement.' . . . [a]

conclusory allegation that defendants conspired to violate [the plaintiff's] rights does not

suffice. . . . ").

Plaintiffs argue that a private party involved in a conspiracy, even though not an official of the State, can be liable under § 1983, citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152, 90 S. Ct. 1598, 1605-06, 26 L. Ed. 2d 142 (1970).  [rec. doc. 38, p. 12].  *Adickes* held that private persons may be liable under § 1983 if they are willful participants in joint activity with the State or its agents.  *Id.* (*citing United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157 (1966)).

Here, plaintiffs set forth no specific factual allegations showing a prior agreement, plan, or meeting of the minds between Teurlings and Bajat.  The only allegations of a relationship between Bajat and Teurlings is that Bajat assisted with directing parking and providing security at Teurlings' football games.  Plaintiffs' bare assertion of the existence of a conspiracy is insufficient to state a claim for relief that is plausible on its face. Simply stated, plaintiffs fail to create a reasonable inference that an agreement between Teurlings and Bajat existed.  *See Jabary,* 547 Fed.Appx. at 611.  Their § 1983 conspiracy claim must therefore be dismissed.

### *Section 1985 Conspiracy Claim*

Plaintiffs also asserts a cause of action under § 1985(3), which provides a cause of action to any person injured as a result of a conspiracy to interfere with one's civil rights.  [rec. doc. 38, p. 12].

Section 1985(3) prohibits, among other things, conspiracies that interfere with the private enjoyment of "equal protection of the laws" and "equal privileges and immunities under the laws."  *See Griffin v. Breckenridge*, 403 U.S. 88, 102-03, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).  To state a claim under § 1985(3), a plaintiff must allege facts

20

demonstrating (1) a conspiracy; (2) for the purpose of depriving a person of the equal

protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury

to a person or a deprivation of any right or privilege of a citizen of the United States.  *Lockett*

*v. New Orleans City*, 607 F.3d 992, 1002 (5th Cir. 2010).  Additionally, claims under this

subsection require that the conspiracy be motivated by racial or other class-based

discriminatory animus.  *Id.*

     Plaintiffs allege that Teurlings and Bajat engaged in a conspiracy that violated J.L.'s

14th Amendment rights to due process and equal protection.  [rec. doc. 38, p. 14].

     The Fourteenth Amendment provides, in relevant part:

> Section 1  . . . .  No State shall make or enforce any law which shall abridge the
> privileges or immunities of citizens of the United States; nor shall any State
> deprive any person of life, liberty, or property, without due process of law, nor
> deny to any person within its jurisdiction the equal protection of the laws.

### *Equal Protection*

     The equal protection clause essentially directs that all persons similarly situated be

treated alike.  *City of Cleburne, Texas v. Cleburne Living Center, Inc*., 473 U.S. 432, 439, 105

S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).  To state a claim under the Equal Protection Clause,

a § 1983 plaintiff must either allege that (a) a state actor intentionally discriminated against

him because of membership in a protected class, or (b) he has been intentionally treated

differently from others similarly situated and that there is no rational basis for the difference in

treatment.  *Gibson v. Texas Dep't of Ins.--Div. of Workers' Comp*., 700 F.3d 227, 238 (5th Cir.

2012); *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir.), *decision clarified on reh'g*, 186 F.3d

633 (5th Cir. 1999).

Here, plaintiffs allege that Teurlings' conduct supports the "reasonable inference" that it jointly engaged itself with a state official, Bajat, for the express purpose of influencing the outcome of a state criminal investigation.  [rec. doc. 38, p. 14].  However, plaintiffs have not pled specific facts to support this allegation.  Additionally, plaintiffs have not alleged purposeful or intentional discrimination; only that it can be "inferred" that racial animus directed Teurlings' "agreement" with Bajat to thwart the cyberbullying investigation.  [rec. doc. 38, p. 14].  Plaintiffs do not make any factual allegations which would support an inference of purposeful or intentional class-based discrimination which played any part in the investigation.

In sum, plaintiffs have failed to present factual allegations to raise their equal protection claim "above the speculative level" and, to the contrary, presents no more than "a suspicion [of] a legally cognizable right of action."  *See Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965. Under *Twombly* and *Iqbal*, these allegations are clearly insufficient.  Thus, plaintiffs have failed to state a legally cognizable equal protection claim.

### ***Procedural Due Process***

Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.  *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901 (1976).

J.L.'s due process claim depends upon her having a property interest.  *Schaper v. City of Huntsville*, 813 F.2d 709, 713 (5th Cir. 1987).  The Constitution does not create property

interests; "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972).

Plaintiffs allege that an unlawful deprivation of J.L.'s property interest occurred when Dugas criminally conspired with Menard to secure pictures of J.L. and used the photos to get J.L. suspended from school.  [rec. doc. 38, pp. 14-15].  Bajat and LCG argue that failure to investigate this alleged criminal conduct does not violate due process.  [rec. doc. 8, pp. 10-11]. The negligent failure to investigate other leads does not violate due process. *Moreno v. City of Progreso, Tex.*, 161 Fed.Appx. 371, 373 (5th Cir. 2005) (*citing Baker v. McCollan*, 443 U.S. 137, 144, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Sanders v. English*, 950 F.2d 1152, 1161-62 (5th Cir.1992)).

Plaintiffs further allege that J.L. had a property interest in her character at school, citing *Christy v. McCalla*, 2011-0366 (La. 12/6/11); 79 So.3d 293, 299.  [rec. doc. 38, p. 16].  There, the court stated as follows:

> A child has an interest, rooted in the constitution, "in not being stigmatized by suspension" or expulsion.  *See Swindle v. Livingston Parish Sch. Bd.*, 655 F.3d 386, 393 (5th Cir. 9/8/11).  The school system, therefore, has a duty under the Due Process Clause of the federal constitution to not arbitrarily suspend or expel a child.  *Id.* " 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied." *Swindle*, 655 F.3d at 393, *quoting Goss*, 419 U.S. at 574, 95 S.Ct. 729.[4]

*Id.* at 299.

---

[4]*Goss v. Lopez*, 419 U.S. 565, 576, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

However, *Christy* involved compulsory public education and relied upon a Louisiana statute, not federal law.  *See Goss*, 419 U.S. at 572-73, 95 S. Ct. at 735 ("Protected interests in property are normally 'not created by the Constitution. Rather, they are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits"); *Swindle*, 655 F.3d at 392 ("Louisiana's statutes create a 'property interest' protected by the Due Process Clause of the Fourteenth Amendment in a public school child and her parents receiving such benefits").

Under federal law, a person's interest in his reputation alone, apart from some more tangible interest such as employment, is not a sufficient liberty or property interest to invoke the procedural protections of the due process clause.  *See Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976); *see also Doe v. Silsbee Independent School Dist.*, 402 Fed.Appx. 852, 854 (5th Cir. 2010) (freedom from false stigmatization does not constitute a protected liberty interest under the Fourteenth Amendment).  Plaintiffs have cited no federal law to the contrary.  Accordingly, this argument lacks merit.

## Claims Against Craft

### *42 U.S.C. § 1983*

A supervisory official may be held liable under § 1983 only if: (i) he affirmatively participates in acts that cause constitutional deprivation; or (ii) implements unconstitutional policies that causally result in plaintiff's injury.  *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011); *Gates v. Texas Dept. of Protective and Regulatory Services*, 537 F.3d 404, 435 (5th Cir. 2008).  Only the direct acts or omissions of government officials will give rise to individual

liability under § 1983.  (emphasis added).  *Alton v. Texas A&M University*, 168 F.3d 196, 200

(5th Cir. 1999); *Marceaux v. City-Parish Consol. Government*, 921 F.Supp.2d 605, 625 (W.D.

La. 2013).

### *Substantive Due Process*

Plaintiffs allege that Craft violated Andres Landor's substantive due process rights

pursuant to 42 U.S.C. § 1983 and the 14th Amendment by transferring him from Metro to

Patrol.

To succeed with a claim based on substantive due process in the public employment

context, the plaintiff must show two things: (1) that he had a property interest/right in his

employment, and (2) that the public employer's termination of that interest was arbitrary or

capricious.  *Lewis v. University of Texas Medical Branch at Galveston*, 665 F.3d 625, 630 (5th

Cir. 2011); *Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir. 1993).

The Constitution does not create property interests.  *Board of Regents of State Colleges

v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).  Although public

employees can be endowed with constitutionally-protected property interests in their

employment, a property interest is not incidental to employment and must be located in an

independent source.  *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d

570 (1972).  The property interest must stem from state law, operation of contract, or other

independent source.  *Cabrol v. Town of Youngsville*, 106 F.3d 101, 105-06 (5th Cir.1997);

*Amos v. City of Monroe*, 2014 WL 2117837, *6 (W.D. La. May 21, 2014).

Defendants concede that Andres Landor, as a civil servant, has a property interest in his continued employment.  [rec. doc. 61, p. 8].  However, they assert that he has failed to allege any property right in his position in the Metro unit from which he was transferred.

The Louisiana statute applicable to transfers of police officers provides that "[a]ny employee may be transferred from any position in the classified service to any other position of the same class within the classified service, at the pleasure of the appointing authority without notice to and confirmation by the board."  LA. REV. STAT. § 33:2489.  Plaintiffs have failed to allege that the Metro and Patrol positions were not in the same class within classified services.  Thus, he has not shown that he had a property interest in the Metro position.  *See Moore v. Otero*, 557 F.2d 435, 437 (5th Cir. 1977) (officer had no property interest in his position as corporal where records revealed that police chief reassigned corporals to regular patrolman's duties).

In opposition, plaintiffs argue that the Second Amended Complaint alleges that Andres Landor's transfer from Metro to Petrol was a *de facto* demotion and that Craft acted with retaliatory animus when he implemented the policy resulting in his transfer/demotion from Metro to Patrol.  [rec. doc. 64, p. 6; rec. doc. 58, ¶ 68].  However, plaintiffs have not pled that Andres Landor had a property interest in his assignment to Metro.  Additionally, they concede that at least one of the three officers transferred from Metro to Patrol was white, which belies their claim of animus.  [rec. doc. 58, ¶ 77].  Thus, this argument lacks merit.

Even assuming that plaintiffs had sufficiently pled a pled a property interest, they have not shown that Andres Landor's transfer from Metro to Petrol was a demotion.  In fact, he

concedes that his pay did not decrease.  [rec. doc. 58, ¶ 83].

In the opposition brief, plaintiffs argue that a transfer can be an adverse employment action even if it does not result in a pay cut, citing *Alvarado v. Texas Rangers*, 492 F.3d 605, 613 (5th Cir. 2007).  [rec. doc. 64, p. 8].  *Alvarado* stated that, to be equivalent to a demotion, "a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse – such as being less prestigious or less interesting or providing less room for advancement."  *Id*. at 613.

However, whether the new position is worse is an objective inquiry.  *Id*. at 614 (*citing Pegram v. Honeywell, Inc*., 361 F.3d 272, 283 (5th Cir. 2004)).  A plaintiff's subjective perception that a demotion has occurred is not enough.  *Id*.  It is insufficient for a plaintiff to show merely that he has been transferred from a job he likes to one he considers less desirable.  *Id*. at 614 ("neither the employee's subjective impressions as to the desirability of the new position nor the employee's idiosyncratic reasons for preferring the new position are sufficient to render the position a promotion").  Rather, a plaintiff must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused him harm.  *Id*.

Circuit precedent establishes that in cases where the evidence produces no objective showing of a loss in compensation, duties, or benefits but, rather, solely establishes that a plaintiff was transferred from a prestigious and desirable position to another position, that evidence is insufficient to establish an adverse employment action.  *Pegram*, 361 F.3d at 283. On these facts, Andres Landor's claim that his reassignment from Metro to Patrol was a less

prestigious or desirable transfer, without more, does not establish an adverse employment action.  *Id*.  Accordingly, he has not stated a substantive due process violation.

### *Procedural Due Process*

Once it is determined that a property interest exists, for purposes of the due process clause of the Fourteenth Amendment, federal law controls as to what process is due. *Henderson v. Sotelo*, 761 F.2d 1093, 1096 (5th Cir. 1985) (*citing Loudermill*, 470 U.S. at 541, 105 S.Ct. at 1492–93).  Here, however, plaintiffs have not sufficiently pled facts showing that Andres Landor had a property interest in his position in the Metro unit.

Even assuming that they had, plaintiffs have not shown a violation of procedural due process.  They argue that, as a civil servant, Andres Landor was entitled to due process before being demoted.  [rec. doc. 64, p. 7].  However, as stated above, § 33:2489 provides that police officers of the same class within classified service are subject to transfer without board approval.

In any event, the pleadings show that Andres Landor's right to due process was not violated.  The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.  *Loudermill*, 470 U.S. at 546, 105 S. Ct. at 1495.  There is no requirement that he have legal representation at a pre-termination hearing.  *See Speiser v. Engle*, 107 Fed.Appx. 459, 461 (6th Cir. 2004) (a plaintiff is not entitled to have his attorney present at a pre-disciplinary hearing – due process requires only notice and an opportunity to respond prior to deprivation of job benefits).

Because Andres Landor has failed to facts showing that he had a property interest in the Metro position, he was not entitled to due process after being transferred.

### *Equal Protection Claim*

Plaintiffs argue that Craft intended to discriminate against Andres Landor, who was black, by failing to investigate Bajat.  [rec. doc. 64, pp. 8-9; rec. doc. 58, ¶¶69, 70-74].

To state a claim under the Equal Protection Clause, a § 1983 plaintiff must either allege that (a) a state actor intentionally discriminated against him because of membership in a protected class, or (b) he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  *Gibson v. Texas Dept. of Ins. – Div. of Workers' Comp.*, 700 F.3d 227, 238 (5th Cir. 2012) (*citing Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir.1999); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)).

A plaintiff must show that defendants acted with a discriminatory purpose and thus cannot base an equal protection claim solely on a personal belief that he was a victim of discrimination.  *Tate v. Louisiana Dep't of Transp. & Dev.*, 2013 WL 796015, *17 (E.D. La. Mar. 4, 2013) (*citing Kossie v. Crain*, 602 F.Supp.2d 786, 792 (S.D.Tex, 2009) and *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir.1995)).  Vague and conclusory allegations are insufficient to raise an equal protection claim.  *Kossie*, 602 F.Supp.2d at 792 (*citing Pedraza v. Meyer*, 919 F.2d 317, 318 n. 1 (5th Cir.1990) (*per curiam*)).

Here, plaintiffs allege that Craft and Bajat should have opened an investigation of Bajat in connection with the allegations in their original complaint, citing LA. REV. STAT. §

40:2531(B)(7), which provides: "[w]hen a formal and written complaint is made against any police employee or law enforcement officer, the superintendent of state police or the chief of police or his authorized representative shall initiate an investigation within fourteen days of the date the complaint is made." [rec. doc. 64, p. 9]. However, plaintiffs have pled no allegations showing that a "formal and written complaint" was made against Bajat.

As plaintiffs have failed to pled sufficient facts, other than vague and conclusory allegations, that Craft intentionally discriminated against him, their claim for violation of Andres Landors' equal protection rights must fail.

### *First Amendment Claim*

Plaintiffs argue that Craft retaliated against Andres Landor after he filed this lawsuit. [rec. doc. 58, ¶¶ 96-100; rec. doc. 64, pp. 9-10].

To establish a First Amendment retaliation claim, a plaintiff must show: (1) that he suffered an adverse employment action; (2) the plaintiff's speech involved a matter of public concern; (3) the plaintiff's interest in speaking outweighed the government's interest in efficiency; and (4) the protected speech motivated the adverse employment action. *Juarez v. Aguilar*, 666 F.3d 325, 332 (5th Cir. 2011); *Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004).

The First Amendment protects a public employee's speech in cases of alleged retaliation only if the speech addresses a matter of "public concern." *Harris ex rel. Harris v. Pontotoc County School Distr.*, 635 F.3d 685, 692 (5th Cir. 2011) (*citing Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Whether an employee's speech can be

30

characterized as constituting speech on a matter of public concern is a legal determination. *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (*citing Connick*, 461 U.S. at 146, 103 S.Ct. at 1684)).

Matters of public concern are those which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Id*. (*quoting Connick*, 461 U.S. at 146, 103 S.Ct. 1684). In the public employment context, "[b]ecause almost anything that occurs within a public agency *could* be of concern to the public, [courts in the Fifth Circuit] 'do not focus on the inherent interest or importance of the matters discussed by the employee.'" *Harris*, 635 F.3d at 692 (*quoting Terrell v. Univ. of Tex. System Police*, 792 F.2d 1360, 1362 (5th Cir. 1986)). Rather, the court's task "is to decide whether the speech . . . was made primarily in the plaintiff's role as a citizen or primarily in his role as employee." *Terrell*, 792 F.2d at 1362; *see also Harris*, 635 F.3d at 692.

"In making this determination, the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." *Terrell*, 792 F.2d at 1362; *see also Harris*, 635 F.3d at 692. Stated differently, speech "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest." *Terrell*, 792 F.2d at 1362 n. 6 (*quoting Connick*, 103 S.Ct. at 1691 n. 8). In cases of mixed speech or motives, "the speaker must have spoken predominantly 'as a citizen' to trigger First Amendment protection." *Dodd v. Childers*, 933 F.2d 271, 274 (5th Cir. 1991) (citation omitted).

As to the first factor, Andres Landor does not show that he suffered an adverse employment action.  Although he argues that his transfer from Metro to Patrol was a demotion, his own allegations in the Complaint show that LPD had implemented a new policy limiting time in Metro to six years.  [rec. doc. 58, ¶ 60].  He admits that he did not receive a pay decrease, and that two other officers – at least one of whom was white – were also transferred.  [rec. doc. 58, ¶¶ 56-57, 77, 83; rec. doc. 61, p. 6].

In *Serna v. San Antonio*, 244 F.3d 479 (5th Cir. 2001), a police officer argued that his transfer from the Downtown Foot and Patrol Bike Unit to a regular patrol unit in another part of San Antonio was an adverse personnel action.  The evidence showed that almost every officer, including the police chief, had spent a substantial portion of their career in a regular patrol unit.  *Id*. at 484.  In finding that the transfer was not an adverse employment action, the Fifth Circuit observed: "[plaintiff] can hardly argue that he suffered a constitutional injury when he was transferred to a duty all of his fellow officers performed for some part of their careers." *Id*.

Likewise, plaintiffs' own pleadings show that the policy limiting police officers' time in Metro to six years applied department-wide.  In fact, at least one of Andres Landor's fellow officers, who was white, was also transferred under the policy.  Plaintiffs have not shown that transfers from Metro or Patrol were ordered as punishment, either for Andres Landor or for anyone else.  *Serna*, 244 F.3d at 485.  Accordingly, plaintiffs's allegations are insufficient to establish that Andres Landor suffered an adverse employment action.

For these reasons, plaintiffs have not alleged a violation of Andres Landor's First Amendment rights and this claim must be dismissed for failure to state a claim upon which relief may be granted.

**Claims Against LCG**

Plaintiffs also assert claims against LCG for violations of the First Amendment, due process (substantive and procedural), and equal protection.  [rec. doc. 64, p. 5].

In a  §1983 action, municipalities and other local governing bodies cannot be held liable under a theory of *respondeat superior*;  rather, liability must be based upon a municipality's official or unofficial policy, custom or procedure which causes a deprivation of plaintiff's constitutional rights.  *Monell v.  Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

To hold a municipality liable under § 1983 for the misconduct of an employee, a plaintiff must show, in addition to a constitutional violation, that an official policy promulgated by the municipality's policymaker was the moving force behind, or actual cause of, the constitutional injury.  *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (*citing Monell*, 436 U.S. at 694).   The official policy itself must be unconstitutional or, if not, must have been adopted "with deliberate indifference to the known or obvious fact that such constitutional violations would result."  *Id*. (*quoting Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004); *see also Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).  A showing of simple or even heightened

negligence will not suffice.  *Johnson* at 309; *see also Escobar v. City of Houston*, 2007 WL 2900581, at *6 (S.D. Tex. Sept. 29, 2007).

Plaintiffs have failed to show any constitutional violations by Craft.  A municipality cannot be held liable for damages based on the actions of one of its employees if such employee inflicted no constitutional harm.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986).   If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the city's policy would have authorized such a deprivation is "quite beside the point."  *Id.*

Accordingly, plaintiffs have failed to state a claim against LCG under *Monell*.

**State Tort Law Claims**

Plaintiffs assert state tort law claims under LA. CIV. CODE articles 2315 and 2316 *against Boyer, Baudier, Dugas and Bajat officially [rec. doc. 1, ¶¶ 107-109]; under article* 2315 against Boyer, Baudier, Dugas, and Bajat, officially and personally [¶¶ 110-119], and under article 2320 against Teurlings and LCG for their vicarious liability [¶¶ 120-125].  Plaintiffs' only claim against Menard, personally, is for intentional infliction of emotional distress.[5]  [rec. doc. 27, p. 1].

---

[5]The Louisiana Supreme Court recognized the "the viability in Louisiana of a cause of action for intentional infliction of emotional distress" in *White v. Monsanto* Co., 585 So.2d 1205, 1209 (La. 1991).  *Robinson v. St. Tammany Parish Public School System*, — F.Supp.2d —, 2013 WL 5701648, *10 (E.D. La. Oct. 18, 2013).  To establish such a claim, a plaintiff must prove "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct."  *Id.*

The decision to exercise or decline supplemental jurisdiction over the state law claims is entirely within the discretion of this Court. *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989).  In making this decision, the Court must consider and weigh both the statutory provisions of 28 U.S.C. § 1367(c)  and the values of judicial economy, convenience, fairness and comity.  *See Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350–51, 108 S.Ct. 614, 619 (1988); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).  The general rule of this Circuit is "to dismiss state claims when the federal claims to which they are pendent have been dismissed."  *Parker & Parsley Petroleum v. Dresser Industries*, 972 F.2d 580, 585 (5th Cir. 1992).

 Defendants asserts that this Court should dismiss plaintiffs' state law claims in the interest of judicial economy, convenience, fairness, and comity.  *Cohill*, 484 U.S.at 350, 108 S.Ct. at 619 (holding dismissal without prejudice proper under such circumstances). Defendants further argue that the Court should dismiss these state claims as a matter of law based on the lack of any substantive claims presented against them by these pleadings.

For the reasons set forth in above, the undersigned recommends that the Court dismiss the pendant state claims as well. The dismissal should be without prejudice.

### Motion to Strike

Based on the undersigned's recommendation to grant the Motions to Dismiss, the Motion to Strike Second Supplemental Complaint Paragraphs 71 and 73 filed by Bajat, LCG, and Craft [rec. doc. 60], is **DISMISSED AS MOOT**.

## **CONCLUSION**

Based on the foregoing reasons, I recommend that the 12(b)(6) Motion to Dismiss filed by Society of the Roman Catholic Church of the Diocese of Lafayette, Teurlings Catholic High School, Inc., Michael Boyer, Robert Baudier, and Tiffany Dugas [rec. doc. 7], the Motion to Dismiss Pursuant to F.R.C.P. 12(b)(6) filed by Detective Stephen Bajat and Lafayette City-Parish Consolidated Government [rec. doc. 8], the Rule 12(b)(6) Motion to Dismiss filed by Elizabeth Menard [rec. doc. 18], the 12(b)(6) Motion to Dismiss First Amended Complaint filed by the Diocese, Teurlings, Boyer, Baudier, and Dugas [rec. doc. 35], the Motion to Dismiss First Amended Complaint Pursuant to F.R.C.P. 12(b)(6) filed by Bajat and LCG [rec. doc. 43], and the Motion to Dismiss Supplemental Complaints Pursuant to F.R.C.P. Rule 12(b)(6) filed by Bajat, LCG and Craft [rec. doc. 61] be **GRANTED**, and that all federal claims against them be **DISMISSED WITH PREJUDICE**.

I further recommend that the Motion to Strike Second Supplemental Complaint Paragraphs 71 and 73 filed by Bajat, LCG, and Chief of Police James "Jim" Craft [rec. doc. 60] be **DISMISSED AS MOOT**.

I further recommend that plaintiffs' state tort law claims under LA. CIV. CODE articles 2315, 2316 and 2320 be **DISMISSED WITHOUT PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy

thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

July 10, 2014 at Lafayette, Louisiana.

C. Michael Hill

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

Copy sent:  RFD
On:  7/14/2014
By:  MBD

37